or we'll call our first case of the day, which is cause number 18-50257, United States of America v. William James Jonas, III. Is the appellant ready to proceed? Appellant is ready, Your Honor. Is the appellee ready to proceed? Yes, I am, Your Honor. I understand that a motion was filed either late yesterday or early today. Do we need to take that matter up? I've not reviewed it, but do we need to take it up before we begin with the argument? Your Honor, if I may, I did provide that for the court. It is unopposed by the government. It's a letter where my client requested that his lawyer both have him removed as his lawyer and appoint new counsel. We just want to be able to reference it, Your Honor, in oral arguments. It's one letter, and so we just wanted to let the court know that that's something that will be ultimately supplemented to the record. All right. Noted. You may proceed. May it please the court, counsel? The only salient fact available to the government was a debt of $700,000 due to Siemens and the fact that Mr. Jonas had committed a series of briberies. Evidence jury heard for a couple days. This gave the government the opportunity to back up into a theory of wire fraud against Jonas. Jonas did not intend to cause pecuniary harm to Siemens or Cruz, and he did not intend to enrich himself with his purported scheme. According to the government, Jonas was going to pay his own salary from this scheme, $200,000 that were budgeted by the city as his fee. It was a salary. It was something he was entitled to that had been budgeted already. So that was not an illegal object of this purported scheme. Paying a contract or contracts to people that he had already been bribed by to complete projects for the city, and it's true, Mr. Jonas did commit bribes. No question about it. But the work that was done was work that the city of Crystal City owed money for. That was work that was done. It was done well, and it had to be paid. That was city business. And other expenses, as stated in the indictment, that were paid. Ultimately, at the end of the year, even though Siemens had been paid two-thirds of the owed amount, it was still $700,000 owed. Now, it was not a total amount due on that date. It was something that was subject to being paid in payments. However, that's what the government is based in its argument on. The linchpin for the government's case is the material misrepresentation, the alleged cost, Siemens and Cruz to come into the agreement. And that was the requirement for a separate account in which to put all the funds to pay Siemens. But that's false. That's simply not supported. The requirement for a separate escrow account only applies to purchase agreements. If you recall, initially, Siemens, which was the corporation that contracted with Crystal City, approached Cruz to try and get them funded this way. Cruz would have none of it. There was no collateral. There was a bad credit by the city. So Siemens tried again. In order to go talk to the city council, they got Cruz together and agreed to do an agreement under a certificate of obligation. It's an arrangement that allows for the city to secure its obligations primarily by levying taxes. Once that occurred, Siemens was all in. And so Siemens and Cruz came in. They could not lose. There's also an additional incentive that Siemens sold to the city council. And that was this claim that once the improvements were started, the city of Crystal City would be saving $200,000 a year. And that money would be there to help pay Siemens for his debt. That was represented by Siemens and testified to a trial. Ultimately, however, if all things failed, there was always the power to levy taxes. That was the drawing power to this agreement by Cruz and Siemens. There's no way they could lose money. It's understood that there was a debt of $54,000. The city was short $54,000 at the end of the year. But with a guaranteed savings of $200,000, it would have been reasonable for Jones or anybody in city council to believe that even if all debts were paid, there still would have been a profit of $200,000 or at least a savings of $200,000 with which to pay Siemens. Council, all of this seems to blink the reality that Cruz's banker on the deal testified that the only way this deal was going to go forward was if the money was segregated into a separate account. Jonas, you say there's no way they could have lost money. Jonas was three months late on the first payment and ended up $700,000 late on the whole deal. So they did, in fact, lose money. And that's just to Siemens. That's to say nothing of the financial hardship that he imposed on Crystal City. And to say that he wasn't personally enriched is really difficult to stomach, given the fact that there was $35,000 in the general fund at the time of the COO's issuing. And there was no way they could have paid the salary, much less the $6,000 spurs tickets and all the other extravagances that Mr. Jonas enriched himself on at the back on the backs of the city. Your Honor, the first issue as far as the requirement to have a separate account, it's true. As a matter of contract, it was required for there to be a separate account that was included in the contract. And there was a clause that allowed Siemens to walk away after 90 days if the money was not funded properly. However, that came and went. In fact, the contract wasn't even funded. The first 90 days passed by, and they moved the deadline for another 90 days after the city council approved the agreement. And that even was moved out to a year until December, after which a 3% surcharge would be added if this was not properly escrowed. Siemens and Cruz would have entered into this agreement anyway. It's ample testimony that they had entered into agreements where the escrow account was not prepared, and they still would have done the deal. They say one thing, but the actions speak louder than words, Your Honor. And that's – Can I ask you a hypothetical question? Because I'm trying to understand this whole thing about the intended loss. Suppose I'm running a Ponzi scheme, and every month I bring in a little bit of money. Every month I pay out a little bit of money to investors to keep them on the line, and every month I take a little bit for myself to buy $6,000 first tickets. So I'm a little bit short, so I have to go out and convince a new investor to give me money so I can pay off the old investors that I owe. And I collect $2,000 in a month from those investors. Now, is the $2,000 my intended loss? Your Honor, I would have a disagreement with the question because we don't believe that this contract with Siemens was entered into to pay for any debts. Totally understood. Totally understood. I'm asking you on my hypothetical. Suppose I go out to fund my Ponzi scheme with $2,000. Is the $2,000 my intended loss? I don't believe so, Your Honor. I just don't believe that – well, it depends. I'm concerned about applying that hypothetical to our case because I don't believe, first of all, that that occurred in this case. Totally agree. The intended loss would obviously have to be whatever it is that Jonas intended at Pecuniary Harm Point, Richmond. And we're talking about first tickets. That is not what the government claims. They're claiming that he is – he had for $2.1 million as the intended loss, which is what he was hit with at the tenancy. We believe that's just outrageous. That's not even close to being real. The thing I'm trying to figure out is if your answer to my question is, well, it depends on what he does with the $2,000. Maybe he pays some investors he owes money. Then you've collapsed actual and intended loss, right? And there is no distinction anymore between actual and intended, whereas under the government's view, the whole $2,000 is the intended loss because he's using it to fund the broader Ponzi scheme. The whole thing is fraudulent. The whole thing is being used for his benefit to keep the fraud going. I understand. But the calculation – are we talking about intended loss, Judge, at the tenancy? Because that was – well, that's how it was calculated, and we disagree with the notion that somehow because the whole contract involved $2.1 million as an agreement, as a contractual agreement. But somehow that is the intended loss. This was a contract that was entered into, in fact, started discussions about this contract even before Jonas was city attorney. He came in. They came into the agreement, and there's no evidence to prove that he entered into the agreement to defraud anybody. That's the central weakness of the argument we argue with Jonas. But he had $35,000 in the general fund when he gets the $2 million from the COOs, and he puts it in the general fund so that he can spend it on stuff not related to the reasons for the COO issues. Well, but as a matter of contract law, that is correct. It was a violation of the 90-day provision, but it's a contractual issue. Separate issue altogether is whether or not Jonas was not allowed to spend that money from the general fund as he saw necessary with the city. It created a contraction, and we add a tension that really wasn't there because Siemens and Cruz were – they had no problems continuing this agreement. Two-thirds of the money was paid to Siemens, and so there's no indication that the rest of the money would not be paid eventually either through the savings or by raising taxes. So there was never a problem with Siemens or Cruz being paid. The money that was spent that were not paid to Siemens were monies that were paid and owed by the city. It included my client's salary. It included other debts and other contracts. I mean, there was an accounting done of all the funds, Justice Oldham, and it was all city money. There may have some spurs tickets here and there, but that is not the crux of the government's case, obviously. And so the primary problem we have is the notion that somehow he created this scheme to fund something that was illegal, and that is not the case. Ultimately, Siemens and Cruz could not lose money. It could not be harmed under this arrangement. No matter what happened, levying of the tax was always there to cover them. It would have been unreasonable for Jonas to believe that he could inflict pecuniary harm on Cruz or that he could enrich himself. It just doesn't make sense with this evidence, Justice. As far as the – we have mentioned how the 90-day requirement was non-material. Siemens and Cruz would have entered into this agreement anyway, and why not? They were not going to lose any money. Siemens had done this before with many cities, many cities that did not have enough money there to fund their own projects. So that's our argument as far as the legal sufficiency. On the issue – the second issue to be discussed is the violation of the right to counsel. Government has mentioned in its response brief, and I quote, that Jonas failed to demonstrate a complete breakdown in communication for irreconcilable conflict. Both Jonas and counsel expressed irreconcilable differences. There was no question about it. Munoz filed – Munoz, former appointed counsel, filed his motion to withdraw. He couldn't talk to Jonas. Jonas wouldn't talk to Munoz. He wanted out. Jonas wanted him out, and he wanted substitute counsel. Jonas knowingly and voluntarily waived representation, and he elected to represent himself. Ultimately, he did, but that is not how all exchanges started. The letter that we have – this is the initial request by Jonas to his lawyer that has not been introduced into the brief. Both parties agreed to put it into the record. Clearly, he's asking for Munoz to withdraw representation and to help him get substitute counsel. Counsel specifically asked Munoz to appoint new counsel. The relationship is, quote, unworkable. Jonas asked for new counsel because there was, quote, a broken dysfunctional relationship. The court, however, was concerned with three things. First, it accused Jonas of playing games. Jonas had just been convicted after a long, grueling trial of a very serious offense. He wanted a different set of eyes on his case. It was his first court-appointed attorney. The court mentioned that Jonas was playing games, that the attorney he had was one in a long list of lawyers. That was factually incorrect. There was one lawyer initially that came in for an initial appearance. It was actually somebody purportedly retained who withdrew soon after. The only attorney that Mr. Jonas functionally had throughout the proceedings, the trial proceedings, was Mr. Munoz. Also, the court mentioned that it had to move on, that it couldn't be playing games and switching lawyers because it had to get to sentencing, which didn't occur until about seven months. The dockets in Del Rio are seriously heavy. Sentencings are delayed for months at a time, sometimes up to a year. It's not uncommon. That was not something that would have prompted the judge to deny substitute counsel. Our position is that at that juncture, one of two things would have happened. The court could have attempted, although it did not. It could have attempted to see if Jonas and his lawyer think back, right? Work it out. Come on. Let's talk it over. Come back in a week. That didn't happen. The judge automatically allowed Munoz to withdraw at that point and then told Jonas that she would not appoint counsel but that he could represent himself. So, Mr. Jonas, in that context, as that was presented, in that particular language, my client then stated, okay, in lieu of new counsel, I'll represent myself. Very important. He did not ask from the outset to represent himself to the extent that the government's response intimated that. That's not correct. He asked counsel. He didn't get counsel. He represented himself. The court said it's your only choice. Time passes. He files a million motions. He is lost. The court, during the Feretta hearing, makes a reference as to how he's a lawyer. He's been licensed in federal, but we know that that's not sufficient for a lawyer to be competent. Even a lawyer cannot be competent in his own defense if he's never practiced criminal law, much less federal law. That was not discussed at the time. There's a hearing in April, however, and we anticipate the government will mention that at some point the judge said, okay, Mr. Jonas, all this talk about in lieu, I don't like it. Do you want counsel? At that juncture, Mr. Jonas would not ask whether he wanted new counsel. This is critical. The language by the court is as follows, and the judge is speaking out loud. And this is at the April hearing, the second hearing, after the initial hearing. At that point, thinking back, it was the court's, as we were talking, it was the court's understanding that there was no legal reason for granting the motion to withdraw. So Mr. Munoz would have remained as your counsel. So she's telling Jonas at the second hearing, look, I wasn't going to leave him on there. But the fact is, I assume it's because the court would have thought, well, you guys go work it out, see what comes up. But that's not what happened. She would remove the attorney and told him his only option to himself. All right, counsel, your time has expired. Thank you. Thank you, Your Honor. Mr. Durbin. Thank you. Good morning. May it please the court. Richard Durbin for the United States. I'll start with the sufficiency issue. It's the government's position that there was that most of what Mr. Aristotle is talking about are factual disputes. They were defensive facts that were raised before the jury. They presented questions to the jury, which the jury resolved. There was significant evidence that Mr. Jonas schemed to defraud Siemens crews. And frankly, I think Judge Oldham, I think you've hit on it. The key to this prosecution, I think, was that Mr. Jonas was basically out to exploit the city of Crystal City, a small city in south Texas of about 7000 residents. And the whole idea behind his scheme and exploiting the what I call the infrastructure contract or the infrastructure fraud. The whole point of that was to to get liquidity for the city so that he could accomplish several things. One is to make sure that he got paid his money, his salary. He made two hundred thousand dollars a year, plus about fifty thousand dollars in various fees, expenses and so forth. And he knew that the city was in dire straits and that there was a serious question about the city being able to meet those obligations. He had considerable child support obligations. He had a lifestyle that was that that that commanded or demanded a salary of him of that for him of that type. So he had he had ample motive. His misrepresentations to the contractor, Siemens and the underwriter crews were twofold. One was the misrepresentation about what he was going to do with or how he was going to hold the money, whether it was going to be segregated in a separate account. And and witnesses for both Siemens and the underwriter testified that it was important that there be a separate account, that it not that the monies that were raised by the certificates of obligation to pay Siemens not be placed in the city's general fund. The other condition on all of the documents, the contract document, the statements, the statement from the city and so forth, was that that money raised by the certificate of obligations would be used exclusively to pay Siemens for the infrastructure improvement project, not to be used for other purposes. Mr. Mr. Jonas evidenced very early on that his intention was otherwise. He, in fact, asked the bond council before the closing. Could the money be used for for paying his fees? He also indicated in November before the deal was closed that he he needed this this deal. He needed the closing to happen before the end of 2014 by the end of the year, because that's when the budget year turned over. And as Judge Oldham, you pointed out, there was only 30 or 40 thousand dollars in the city's budget at that point. So so the fraud, I think the sufficiency of the fraud is really not a significant issue. I think an issue that you hit on, Judge Oldham, concerns the intended loss or the actual loss. What's the appropriate measure for purposes of punishment? And the appellant's argument is that, look, Siemens got seven hundred thousand dollars. I mean, set aside all the other arguments that, well, they could have gotten money from taxes. They it was all previously obligated. The fraud was there. That's not what the issue is. Question is, should we be looking at actual loss of about seven hundred thousand dollars that Siemens did not receive under the contract? Basically, the profit. Or is it the full amount that the district court applied? And and as your hypothetical points out, Judge Oldham, I think that's what was going on here, is that Mr. Jonas was using the entire amount of the funding to continue to operate his corruption of the city of Crystal City with his cohorts on the city council and the mayor, because it was their scheme to to exploit the city's resources and the city's opportunities for their personal benefit. And to do that, he needed the liquidity. And what he did with the liquidity was he put the whole amount at risk. But he was the one who made decisions about where payments were made. And some of those payments appear to have been made. The inference is certainly there that he made payments for legitimate invoices by the undercover operator operator. The contractor named Heil Heil made several relatively small bribe payments to to Jonas in exchange for Jonas basically giving priority to those those particular invoices that had been outstanding for some time. But our position and I think the district court in her sentencing, ultimately, when when she stated the reasons for her sentence made very clear Jonas's primary harm for purposes of punishment was the harm he did to Crystal City. It wasn't just the amount of harm that he did to Siemens, the $700,000 crews. We weren't we weren't able to calculate at the time what the ultimate injury was or the damage was that was done to either the underwriter or the certificate holders because of the complexities of how those markets work and whether the city would be able to pay interest and maybe pay off the certificates at a later time. But what the district judge found for this reason, we argue that even if there is a mistake in the calculation of the of the loss amount, the district court made entirely clear she was not imposing a guideline sentence. She was imposing a sentence based on the statutory considerations and she listed both the circumstances of the harm to Crystal City that the city manager of Crystal City appeared at sentencing and gave allocution and said Crystal City didn't have the wherewithal to enter into the infrastructure agreement in the first place. They could not take on $2.1 million of indebtedness and the inference is Jonas did it because he was looking to continue to have the resources available to him to run his operation to run the table to run the city and then engage in his bribe schemes that followed the bribe scheme with Hyle that came along and then he was he didn't realize any any of it but he was he was working on a series of kickbacks in connection with the solar park project. He was both putting a lawyer on to the project up front trying to get an agreement that he would get a part of the lawyers fees and he alluded to the fact that on the back end when the solar park was up and running. He was going to get part of whatever the proceeds were from the sale of the electricity to be generated by the solar park, all of which evidence is what he was doing to Crystal City and what his purpose was. And the purpose wasn't necessarily focused solely on causing harm to Siemens is misrepresentations to Siemens and to cruise or to induce them to enter into the agreement. And as I say, both of the employees testified, our employees for both testified that those representations were material to their entering into those agreements or those contracts. So, on the issue of I mean just to cap that off on the issue of sufficiency of evidence I think there's ample evidence from which the jury could find beyond a reasonable doubt that there was that Mr. Jones perpetrated a fraud and that he had the intent to perpetrate the fraud, and that the misrepresentations were material, and that the object of the fraud was material gain. He both wanted control over and some of the funds from the generation of the generated by the certificates obligation, but he also wanted to continue. Basically exploiting the city of Crystal City on the issue of right to counsel. I believe. At one point, Mr. else, a new council. The district court fairly quickly held a hearing on that, and she inquired of both Mr Munoz, and Mr. Mr. Jonas. What, what was the problem, what were the problems. Mr Munoz said well he didn't state a reason for why he wanted a new council. The court then inquired into it, and Mr. Jonas explained that well, there were differences of opinion. He had provided a list of potential witnesses and questions in connection with his release on bond, which Mr Munoz did not ask. So he had some disagreement about that he had some concern that he had made arrangements either through himself personally or through his parents to meet with Mr Munoz on several occasions, and Mr Munoz didn't make those meetings. Basically, Mr. Jonas was looking to have another another bite at a different lawyer now that we were getting into sentencing. And I think the, the, the controlling authority is clear he has a right to counsel. But as appointed counsel he doesn't have a right to counsel of his choice, or his preference, or to shop around to find one that he might think would do him a better job. The district court inquired carefully, the, the colloquy. The sequence that the colloquy to me as I read the colloquy with the district court, Mr. Jonas, and Mr Munoz before getting into that that status hearing, which I believe was on September 26 of 2017 before getting in there, they had discussed between them, according to Mr Munoz, the potential or possibility of Mr Jonas representing himself. So it wasn't something that the court foisted on him before he got to court, it was something that he and counsel had contemplated beforehand, and the court was basically making clear. I'm not going to replace Mr Munoz you have appointed counsel and she said he was he worked hard for you at trial. Mr Jonas disagreed. But I think the record shows that Mr Munoz did do a good job with what he had to work with. And upon telling Mr Jonas that she wasn't going to appoint new counsel, she mentioned or you can represent yourself and he immediately said, I'll represent myself, which I wasn't there but as I read the transcript it seems like she was sort of surprised by that, but she pursued it. She asked, is this what you really want to do she talked with him about his experience 30 years as a lawyer that he was admitted to the bar the Western District of Texas, that he was intelligent. And he represented he could handle himself and he could do it. She also talked with Mr Munoz, who said yes we had a conversation. I suggested to him there are pitfalls and self representation it's generally not a good idea, but he's an intelligent man, we discussed it, he says he wants to do it. And, and he proceeded to make very clear at the September 26 hearing that he wanted to represent himself. He did represent himself through a series of various motions and some interlocutory appeals that he also filed that are in the record. But when it finally got to the hearing before the sentencing hearings they were in the spring of 2018, I believe it was there was one on April 25. And, and on that occasion, that the district court had the transcript of the September status hearing, where Mr Jonas waived his, his right to counsel and decided he wanted to represent himself and she went through that hearing with Mr Jonas and and about two thirds of the way through it she finally said Mr Jonas, do you want me to appoint counsel for you. There's no discussion whether it's going to be Munoz or somebody else, but she asked you want me to appoint counsel he said no I want to represent myself, but I do want appointed counsel for appeal. So he knew exactly what he was doing. And if he wanted counsel, he was given the opportunity, at least two months before the sentencing to have counsel appointed and he turned it down. And so I think under those circumstances the court did not abuse its discretion in denying his request for new substitute counsel, the court effectively obtained from him a voluntary valid waiver of his right to counsel, and he proceeded to represent himself and he made that clear over a period of probably eight or nine months that he wanted to represent himself. And so those are those are the main issues. The one point I want to also touch back on in connection with the sentencing. Is that the after after considering the totality of the district courts comments during sentencing. The standard for harmless error for a if the court finds that there was an error in the way in which the loss amount was calculated. The test is is basically whether or not the court would have have done the same thing. If she whether or not she would have imposed the same sentence for the same reasons. And I think that the courts articulation of reasons that she went through and she went through them quite clearly but they they included that Mr. Jonas has a sliding scale of truthfulness. So she was looking at his character. He blames others and always absolves himself. He falsely accused witnesses of giving false testimony at trial. He falsely accused prosecutors of sponsoring false testimony. During his scheme he fired city employees who wouldn't do what he said in order to make the scheme work. He was in it for personal matters. He caused devastating harm to Crystal City. And as she took it she put it. He took advantage of a trusting community and he took them to the cleaners. I think if you were to send this back to the district court and say, well, the actual lost Siemens was $700,000 not the intended amount of $2.1 million. I think she has made quite clear that she would look at all of that. By the way, a $700,000 loss would be only a two level change in the guidelines. If the $700,000 were the amount and I think that the district court made quite clear under the applicable standard that she would impose the same sentence for the same reason she did before. Unless you want me to address something else or unless there are any questions, I'll return the remainder of my time to the court. All right. Thank you. Council. Thank you. Roboto. You need to turn your mic on, Mr. Aristotle. Got it. Thank you. Intended loss. There was no intended loss of $2.1 million. Siemens did the bona fide contract with eyes fully open. There was no material misrepresentation. That contract was going to get done no matter what. The contract was completed. The city of Crystal City received all the benefits from that contract. It cost $2.1 million. The only reason we're talking about $700,000 is because the prosecution, the arrest, the ouster by Mr. Jonas' ouster occurred at a point where there was still a balance of $700,000. There's been no evidence shown anywhere that Siemens would be out, that Jonas could believe that Siemens would be out. Let me ask you a question. How are they going to pay this back? What was the plan? Yes, Your Honor. Well, one of the ways was through these purported savings that Siemens sold everybody. $200,000 a year. That alone testimony aptly showed that the $200,000. That was $2.1 million and they were going to pay it back out of savings, which was $200,000 a year. So that would have been 10 years, right? Well, presumably, but there was testimony that was presented by witnesses, but I think it was Killingworth, one of the attorneys. Also, Your Honor, had that failed for any reason, the city raised its taxes. And all of that was fully contemplated in the contract. Everybody was aware of it. It was the lynchpin. The city council, I take it, you're saying that the city council approved the notion that if for some reason we couldn't pay this stuff off, we would just raise taxes. The city council agreed to that? Yes, Your Honor. That was a contract that was entered into. But ultimately, the reason that Cruz funded it the second time around that Siemens tried to get it funded was because ultimately it's funded by taxes. The thing we don't know, Justice King, is that would happen. There was no evidence shown that the city would not have been able to raise taxes. There was no evidence shown that the savings did not come through. And so we're stuck with this figure of $700,000 at a minimum, because it's where it all stopped. We don't believe that the intent or actual law can be measured on those figures. Counsel, how much money was in the general fund on the day that Jonas was arrested? I believe it was $50,000. I think the city was out $54,000. How much money, cash on hand, did the city have? I don't believe it had any, Judge. $2,000. So how were they going to pay the $700,000? Your Honor, at that juncture, I guess if we talk about expectations about how Siemens sold it, the city would have been reasonable in believing that they could have paid it from the savings, the $200,000, once the improvements began. And we would have to assume it started the following year, right? Not that same year. But also levying taxes. It was all contemplated.  Ad valorem taxes, Judge. It's what was discussed by all the parties. So are they below the state law cap on ad valorem taxes? I'm not aware, Judge. There was no testimony on that. All we know is that the contract provided for that safety valve for the parties in case everything else failed. Certificates of obligation are secured by that type of funding. So on your rationale, I want to make sure I understand your theory. Your theory is that if Jonas had taken the $2 million from the COO obligations and put the entire $2 million in his pocket, it would have been totally fine because the city could have raised $2 million in taxes. No, because under that example, Justice Oldham, you clearly can show there was an intent to enrich himself. And that is not what was demonstrated with the amount. But you can't do that with $6,000 spurs tickets. Perhaps $6,000, Judge, but we're dealing with huge figures here. And my client is being hit with $2.1 million of actual intended loss, which is just simply not, it doesn't figure, Judge. It should not be applied. On the issue of right to counsel, I practiced before Judge Kaysing in the Southern District for about three years as a federal defender, and he was loathe to change lawyers. He always got the parties to talk about it, try and work it out, only then would he then substitute counsel. The bottom line is the judge did not appoint counsel. She was not going to appoint counsel. And in lieu of substitute counsel, my client was left to represent himself. And that was an error. It was a violation of the Sixth Amendment by the court. My client should, at the very least, receive a new sentencing hearing if the court does not sustain the challenge to the legal sufficiency of the wire fraud conviction. I believe I'm out of time. Thank you, counsel. The court will take this matter under advisement.